# SAUCIER *v.* KATZ ET AL.

No. 99–1977.   Argued March 20, 2001—Decided June 18, 2001

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined, and in which SOUTER, J., joined as to Parts I and II. GINSBURG, J., filed an opinion concurring in the judgment, in which STEVENS and BREYER, JJ., joined, *post*, p. 209. SOUTER, J., filed an opinion concurring in part and dissenting in part, *post*, p. 217.

*Deputy Solicitor General Clement* argued the cause for petitioner. On the briefs were former *Solicitor General Waxman, Acting Solicitor General Underwood, Assistant Attorney General Ogden, Jeffrey A. Lamken, Barbara L. Herwig,* and *Edward Himmelfarb.*

*J. Kirk Boyd* argued the cause for respondents. With him on the brief was *David H. Williams.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Texas et al. by *John Cornyn,* Attorney General of Texas, *Andy Taylor,* First Assistant Attorney General, *Gregory S. Coleman,* Solicitor General, and *Lisa R. Eskow,* Assistant Solicitor General, joined by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Mark Pryor* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *James E. Ryan* of Illinois, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Eliot Spitzer* of New York, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington; for the Grand Lodge of the Fraternal Order of Police by *Tom Rutherford;* and for the National Association of Police Organizations et al. by *Stephen R. McSpadden.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *David Rudovsky, Michael Avery, Ruth E. Harlow, Steven R. Shapiro,* and *Alan L. Schlosser;* and for the Association of the Bar of the City of New York by *Leon Friedman* and *Ronald J. Tabak.*

JUSTICE KENNEDY delivered the opinion of the Court.

In this case a citizen alleged excessive force was used to arrest him. The arresting officer asserted the defense of qualified immunity. The matter we address is whether the requisite analysis to determine qualified immunity is so intertwined with the question whether the officer used excessive force in making the arrest that qualified immunity and constitutional violation issues should be treated as one question, to be decided by the trier of fact. The Court of Appeals held the inquiries do merge into a single question. We now reverse and hold that the ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest.

I

In autumn of 1994, the Presidio Army Base in San Francisco was the site of an event to celebrate conversion of the base to a national park. Among the speakers was Vice President Albert Gore, Jr., who attracted several hundred observers from the military and the general public. Some in attendance were not on hand to celebrate, however. Respondent Elliot Katz was concerned that the Army's Letterman Hospital would be used for conducting experiments on animals. (Katz was president of a group called In Defense of Animals. Although both he and the group are respondents here, the issues we discuss center upon Katz, and we refer to him as "respondent.") To voice opposition to the possibility that the hospital might be used for experiments, respondent brought with him a cloth banner, approximately 4 by 3 feet, that read "Please Keep Animal Torture Out of Our National Parks." In the past, as respondent was aware, members of the public had been asked to leave the military base when they engaged in certain activities, such as distributing handbills; and he kept the banner concealed under his jacket as he walked through the base.

The area designated for the speakers contained seating for the general public, separated from the stage by a waist-high fence. Respondent sat in the front row of the public seating area. At about the time Vice President Gore began speaking, respondent removed the banner from his jacket, started to unfold it, and walked toward the fence and speakers' platform.

Petitioner Donald Saucier is a military police officer who was on duty that day. He had been warned by his superiors of the possibility of demonstrations, and respondent had been identified as a potential protester. Petitioner and Sergeant Steven Parker—also a military police officer, but not a party to the suit—recognized respondent and moved to intercept him as he walked toward the fence. As he reached the barrier and began placing the banner on the other side, the officers grabbed respondent from behind, took the banner, and rushed him out of the area. Each officer had one of respondent's arms, half-walking, half-dragging him, with his feet "barely touching the ground." App. 24. Respondent was wearing a visible, knee-high leg brace, although petitioner later testified he did not remember noticing it at the time. Saucier and Parker took respondent to a nearby military van, where, respondent claims, he was shoved or thrown inside. *Id.*, at 25. The reason for the shove remains unclear. It seems agreed that respondent placed his feet somewhere on the outside of the van, perhaps the bumper, but there is a dispute whether he did so to resist. As a result of the shove, respondent claims, he fell to the floor of the van, where he caught himself just in time to avoid any injury. The officers drove respondent to a military police station, held him for a brief time, and then released him. Though the details are not clear, it appears that at least one other protester was also placed into the van and detained for a brief time. *Id.*, at 27.

Respondent brought this action in the United States District Court for the Northern District of California against

petitioner and other officials pursuant to *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), alleging, *inter alia*, that defendants had violated respondent's Fourth Amendment rights by using excessive force to arrest him. The District Court granted the defendants' motions for summary judgment on the grounds of qualified immunity on all claims other than the excessive force claim against Saucier. It held a dispute on a material fact existed concerning whether excessive force was used to remove respondent from the crowd and place him into the van. App. to Pet. for Cert. 27a. The District Court held that the law governing excessive force claims was clearly established at the time of the arrest, and that "[i]n the Fourth Amendment context, the qualified immunity inquiry is the same as the inquiry made on the merits." *Id.*, at 29a–30a. As a result, it ruled, petitioner was not entitled to summary judgment. *Id.*, at 30a.

In the United States Court of Appeals for the Ninth Circuit petitioner filed an interlocutory appeal from the denial of qualified immunity. 194 F. 3d 962 (1999). The Court of Appeals affirmed, noting at the outset its two-part analysis for qualified immunity questions. First, the Court of Appeals considers "whether the law governing the official's conduct was clearly established." *Id.*, at 967. If it was not, that ends the matter, and the official is entitled to immunity. If, however, the law was clearly established when the conduct occurred, the Court of Appeals' second step is to determine if a reasonable officer could have believed, in light of the clearly established law, that his conduct was lawful. *Ibid.* As to the first step of its analysis, the court observed that *Graham* v. *Connor*, 490 U. S. 386 (1989), sets forth the objective reasonableness test for evaluating excessive force claims, a principle the Court of Appeals concluded was clearly established for qualified immunity purposes. The court then concluded that the second step of the qualified immunity inquiry and the merits of the Fourth

Amendment excessive force claim are identical, since both concern the objective reasonableness of the officer's conduct in light of the circumstances the officer faced on the scene. 194 F. 3d, at 968. On this reasoning, summary judgment based on qualified immunity was held inappropriate. *Id.*, at 968–969.

Saucier, represented by the Government of the United States, sought review here, arguing the Court of Appeals erred in its view that the qualified immunity inquiry is the same as the constitutional inquiry and so becomes superfluous or duplicative when excessive force is alleged. We granted certiorari, 531 U. S. 991 (2000).

## II

The Court of Appeals ruled first that the right was clearly established; and second that the reasonableness inquiry into excessive force meant that it need not consider aspects of qualified immunity, leaving the whole matter to the jury. 194 F. 3d, at 967. This approach cannot be reconciled with *Anderson* v. *Creighton*, 483 U. S. 635 (1987), however, and was in error in two respects. As we shall explain, the first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered on a more specific level than recognized by the Court of Appeals.

In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell* v. *Forsyth*, 472 U. S. 511, 526 (1985). The privilege is "an *immunity from suit* rather than a mere defense to lia-

bility; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Ibid.* As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter* v. *Bryant,* 502 U. S. 224, 227 (1991) *(per curiam).*

A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. *Siegert* v. *Gilley,* 500 U. S. 226, 232 (1991). In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition;. and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

In this litigation, for instance, there is no doubt that *Graham* v. *Connor, supra,* clearly establishes the general

proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U. S., at 640. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See *Wilson* v. *Layne*, 526 U. S. 603, 615 (1999) ("[A]s we explained in *Anderson*, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established").

The approach the Court of Appeals adopted—to deny summary judgment any time a material issue of fact remains on the excessive force claim—could undermine the goal of qualified immunity to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. See *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

This is not to say that the formulation of a general rule is beside the point, nor is it to insist the courts must have agreed upon the precise formulation of the standard. Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts

had not agreed on one verbal formulation of the controlling standard.

The Court of Appeals concluded that qualified immunity is merely duplicative in an excessive force case, eliminating the need for the second step where a constitutional violation could be found based on the allegations. In *Anderson,* a warrantless search case, we rejected the argument that there is no distinction between the reasonableness standard for warrantless searches and the qualified immunity inquiry. We acknowledged there was some "surface appeal" to the argument that, because the Fourth Amendment's guarantee was a right to be free from "unreasonable" searches and seizures, it would be inconsistent to conclude that an officer who acted unreasonably under the constitutional standard nevertheless was entitled to immunity because he " 'reasonably' acted unreasonably." 483 U. S., at 643. This superficial similarity, however, could not overcome either our history of applying qualified immunity analysis to Fourth Amendment claims against officers or the justifications for applying the doctrine in an area where officers perform their duties with considerable uncertainty as to "whether particular searches or seizures comport with the Fourth Amendment." *Id.,* at 644. With respect, moreover, to the argument made in *Anderson* that an exception should be made for Fourth Amendment cases, we observed "the heavy burden this argument must sustain to be successful," since "the doctrine of qualified immunity reflects a balance that has been struck 'across the board.'" *Id.,* at 642 (quoting *Harlow* v. *Fitzgerald, supra,* at 821). We held that qualified immunity applied in the Fourth Amendment context just as it would for any other claim of official misconduct. 483 U. S., at 644.

Faced, then, with the heavy burden of distinguishing *Anderson* and of carving out an exception to the typical qualified immunity analysis applied in other Fourth Amendment contexts, the primary submission by respondent in defense

of the Court of Appeals' decision is that our decision in *Graham* v. *Connor*, 490 U. S. 386 (1989), somehow changes matters. *Graham*, in respondent's view, sets forth an excessive force analysis indistinguishable from qualified immunity, rendering the separate immunity inquiry superfluous and inappropriate. Respondent asserts that, like the qualified immunity analysis applicable in other contexts, the excessive force test already affords officers latitude for mistaken beliefs as to the amount of force necessary, so that "*Graham* has addressed for the excessive force area most of the concerns expressed in *Anderson*." Brief for Respondents 7. Respondent points out that *Graham* did not address the interaction of excessive force claims and qualified immunity, since the issue was not raised, see 490 U. S., at 399, n. 12; and respondent seeks to distinguish *Anderson* on the theory that the issue of probable cause implicates evolving legal standards and resulting legal uncertainty, a subject raising recurrent questions of qualified immunity. By contrast, respondent says, excessive force is governed by the standard established in *Graham*, a standard providing ample guidance for particular situations. Finally, respondent adopts the suggestion made by one Court of Appeals that the relevant distinction is that probable cause is an *ex post* inquiry, whereas excessive force, like qualified immunity, should be evaluated from an *ex ante* perspective. See *Finnegan* v. *Fountain*, 915 F. 2d 817, 824, n. 11 (CA2 1990).

These arguments or attempted distinctions cannot bear the weight respondent seeks to place upon them. *Graham* did not change the qualified immunity framework explained in *Anderson*. The inquiries for qualified immunity and excessive force remain distinct, even after *Graham*.

In *Graham*, we held that claims of excessive force in the context of arrests or investigatory stops should be analyzed under the Fourth Amendment's "objective reasonableness standard," not under substantive due process principles.

490 U. S., at 388, 394. Because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *id.*, at 397, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective, *id.*, at 396. We set out a test that cautioned against the "20/20 vision of hindsight" in favor of deference to the judgment of reasonable officers on the scene. *Id.*, at 393, 396. *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim, "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*, at 396. If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.

The qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances. This reality serves

to refute respondent's claimed distinction between excessive force and other Fourth Amendment contexts; in both spheres the law must be elaborated from case to case. Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force," *Priester* v. *Riviera Beach*, 208 F. 3d 919, 926–927 (CA11 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

*Graham* and *Anderson* refute the excessive force/probable cause distinction on which much of respondent's position seems to depend. The deference owed officers facing suits for alleged excessive force is not different in some qualitative respect from the probable-cause inquiry in *Anderson*. Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions. The same analysis is applicable in excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable.

The temporal perspective of the inquiry, whether labeled as *ex ante* or *ex post*, offers no meaningful distinction between excessive force and other Fourth Amendment suits. *Graham* recognized as much, reviewing several of our probable-cause and search warrant cases, then stating that "[w]ith respect to a claim of excessive force, the same standard of reasonableness at the moment applies." 490 U. S., at 396 (discussing use of force under *Terry* v. *Ohio*, 392 U. S. 1 (1968); probable cause to arrest under *Hill* v. *California*, 401 U. S. 797 (1971); and search warrant requirements under

*Maryland* v. *Garrison,* 480 U. S. 79 (1987)); see also *Hunter* v. *Bryant,* 502 U. S., at 228 ("Probable cause existed if 'at the moment the arrest was made . . . the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing'" a crime had been committed (quoting *Beck* v. *Ohio,* 379 U. S. 89, 91 (1964))). Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.

## III

The case was presented to the Court of Appeals on the assumption that respondent's seizure and brief detention did not violate clearly established First Amendment privileges and did not violate the Fourth Amendment right to be free from arrest without probable cause, as distinct from the force used to detain. The sole question, then, is whether the force used violated a clearly established Fourth Amendment protection so that petitioner was not entitled to immunity.

Our instruction to the district courts and courts of appeals to concentrate at the outset on the definition of the constitutional right and to determine whether, on the facts alleged, a constitutional violation could be found is important. As we have said, the procedure permits courts in appropriate cases to elaborate the constitutional right with greater degrees of specificity. Because we granted certiorari only to determine whether qualified immunity was appropriate, however, and because of the limits imposed upon us by the questions on which we granted review, we will assume a constitutional violation could have occurred under the facts alleged based simply on the general rule prohibiting excessive force, then proceed to the question whether this general prohibition against excessive force was the source for clearly established law that was contravened

in the circumstances this officer faced. There was no contravention under this standard. Though it is doubtful that the force used was excessive, we need not rest our conclusion on that determination. The question is what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards.

Respondent's excessive force claim for the most part depends upon the "gratuitously violent shove" allegedly received when he was placed into the van, although respondent notes as well that the alleged violation resulted from the "totality of the circumstances," including the way he was removed from the speaking area. See Brief for Respondents 3, n. 2.

These circumstances, however, disclose substantial grounds for the officer to have concluded he had legitimate justification under the law for acting as he did. In *Graham* we noted that "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." 490 U. S., at 396. A reasonable officer in petitioner's position could have believed that hurrying respondent away from the scene, where the Vice President was speaking and respondent had just approached the fence designed to separate the public from the speakers, was within the bounds of appropriate police responses.

Petitioner did not know the full extent of the threat respondent posed or how many other persons there might be who, in concert with respondent, posed a threat to the security of the Vice President. There were other potential protesters in the crowd, and at least one other individual was arrested and placed into the van with respondent. In carrying out the detention, as it has been assumed the officers had the right to do, petitioner was required to recognize the necessity to protect the Vice President by securing respondent and restoring order to the scene. It cannot be said

there was a clearly established rule that would prohibit using the force petitioner did to place respondent into the van to accomplish these objectives.

As for the shove respondent received when he was placed into the van, those same circumstances show some degree of urgency. We have approved the observation that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Ibid.* (citations omitted). Pushes and shoves, like other police conduct, must be judged under the Fourth Amendment standard of reasonableness.

In the circumstances presented to this officer, which included the duty to protect the safety and security of the Vice President of the United States from persons unknown in number, neither respondent nor the Court of Appeals has identified any case demonstrating a clearly established rule prohibiting the officer from acting as he did, nor are we aware of any such rule. Our conclusion is confirmed by the uncontested fact that the force was not so excessive that respondent suffered hurt or injury. On these premises, petitioner was entitled to qualified immunity, and the suit should have been dismissed at an early stage in the proceedings.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS and JUSTICE BREYER join, concurring in the judgment.

In *Graham* v. *Connor*, 490 U. S. 386 (1989), the Court announced and described an "objective reasonableness" standard to govern all claims that law enforcement officers, in violation of the Fourth Amendment, used excessive force in the course of an arrest. Measuring material facts of this case that are not subject to genuine dispute against the *Graham*

standard, I conclude that officer Saucier's motion for summary judgment should have been granted. I therefore concur in the Court's judgment. However, I would not travel the complex route the Court lays out for lower courts.

Application of the *Graham* objective reasonableness standard is both necessary, under currently governing precedent, and, in my view, sufficient to resolve cases of this genre. The Court today tacks on to a *Graham* inquiry a second, overlapping objective reasonableness inquiry purportedly demanded by qualified immunity doctrine. The two-part test today's decision imposes holds large potential to confuse. Endeavors to bring the Court's abstract instructions down to earth, I suspect, will bear out what lower courts have already observed—paradigmatically, the determination of police misconduct in excessive force cases and the availability of qualified immunity both hinge on the same question: Taking into account the particular circumstances confronting the defendant officer, could a reasonable officer, identically situated, have believed the force employed was lawful? See, *e. g., Roy* v. *Inhabitants of Lewiston,* 42 F. 3d 691, 695 (CA1 1994); *Rowland* v. *Perry,* 41 F. 3d 167, 173 (CA4 1994). Nothing more and nothing else need be answered in this case.

## I

All claims that law enforcement officers have used excessive force in the course of an arrest, *Graham* made explicit, are to be judged "under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U. S., at 395. Underlying intent or motive are not relevant to the inquiry; rather, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.,* at 397. The proper perspective in judging an excessive force claim, *Graham* explained, is that of "a reasonable officer on the scene" and "at the moment" force was employed. *Id.,* at 396. "Not every push or shove," the

Court cautioned, "even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Ibid.* (citation omitted). "The calculus of reasonableness" must allow for the reality that "police officers are often forced to make split-second judgments" about the force a particular situation warrants "in circumstances that are tense, uncertain, and rapidly evolving." *Id.,* at 396–397.

Under *Graham's* instructions, the question in this case is whether officer Saucier, in light of the facts and circumstances confronting him, could have reasonably believed he acted lawfully. Here, as in the mine run of excessive force cases, no inquiry more complex than that is warranted.

Inspecting this case under *Graham's* lens, and without doubling the "objectively reasonable" inquiry, I agree that Katz's submissions were too slim to put officer Saucier to the burden of trial. As the Court points out, it is not genuinely in doubt that "[a] reasonable officer in [Saucier's] position could have believed that hurrying [Katz] away from the scene . . . was within the bounds of appropriate police responses." *Ante,* at 208. Katz's excessive force claim thus depended on the "gratuitously violent shove" he allegedly received. *Ibid.;* see Brief for Respondents 3, n. 2 (conceding that "the gratuitous violent shove" was essential to Katz's excessive force claim).

Yet Katz failed to proffer proof, after pretrial discovery, that Saucier, as distinguished from his fellow officer Parker,[1] had a hand in the allegedly violent shove.[2] Saucier, in his

---

[1] Though named as a defendant, Parker was never served with the complaint, and therefore did not become a party to this litigation. See Brief for Petitioner 3, n. 4.

[2] See Fed. Rule Civ. Proc. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial.").

deposition, denied participating in any shove, see App. 39–40, while Katz, in his deposition, said, without elaborating: "They [Parker and Saucier] pretty much threw me in. Just shoved me in," *id.*, at 25. But critically, at no point did Katz say, specifically, that Saucier himself, and not only Parker, pushed or shoved.

Katz's reluctance directly to charge Saucier with pushing or shoving is understandable in view of a television news videotape of the episode Katz presented as an exhibit to his complaint. See App. to Pet. for Cert. 27a. The videotape shows that the shove, described by Katz as gratuitously violent, came from the officer on the right side of the police van, not from the officer positioned on the left side. It is undisputed that the officer on the right is Parker, the officer on the left, Saucier. See Pet. for Cert. 27–28, and n. 19; Brief for Petitioner 50, n. 26. Mindful of *Graham*'s cautionary observation that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," 490 U. S., at 396 (citation omitted), and in view of Katz's failure to deny that the shove alleged to establish excessive force came from Parker alone, not from Saucier, I am persuaded that Katz tendered no triable excessive force claim against Saucier.[3]

## II

In the Court's opinion, *Graham* is inadequate to control adjudication of excessive force cases. *Graham* must be overlaid, the Court maintains, by a sequential qualified immunity inquiry. *Ante*, at 200. The Court instructs lower courts first to undertake what appears to be an unadorned

---

[3] As the Court observes, there is a dispute whether Katz was resisting arrest at the time he was placed in the van. *Ante*, at 198. That dispute is irrelevant, however, in view of the absence of any indication that Saucier employed excessive force in removing Katz from the site of the celebration and placing him in the van. See *Rowland* v. *Perry*, 41 F. 3d 167, 174 (CA4 1994) ("[d]isputed versions of the facts alone are not enough to warrant denial of summary judgment").

*Graham* inquiry, *i. e.*, to consider initially whether the parties' submissions, viewed favorably to the plaintiff, could show that the officer's conduct violated the Fourth Amendment. *Ante*, at 201. If the plaintiff prevails on that "threshold question," *ibid.*, the trial court is then to proceed to the "dispositive [qualified immunity] inquiry," asking "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted," *ante*, at 202.[4]

In the instant case, however, the Court finds that procedural impediments stop it from considering first "whether a constitutional right would have been violated on the facts alleged." *Ante*, at 200, 207–208. The Court therefore "assume[s] a constitutional violation could have occurred," *ante*, at 207—*i. e.*, it supposes a trier could have found that officer Saucier used force excessive under *Graham*'s definition. Even so, the Court reasons, qualified immunity would shield Saucier because he could have "concluded he had legitimate justification under the law for acting as he did." *Ante*, at 208.

Skipping ahead of the basic *Graham* (constitutional violation) inquiry it admonished lower courts to undertake at the outset, the Court failed to home in on the duplication inherent in its two-step scheme. As lower courts dealing with excessive force cases on the ground have recognized, however, this Court's decisions invoke "the same 'objectively reasonable' standard in describing both the constitutional test of liability [citing *Graham*, 490 U. S., at 397], and the . . . standard for qualified immunity [citing *Anderson* v. *Creighton*, 483 U. S. 635, 639 (1987)]." *Roy*, 42 F. 3d, at

---

[4] The Court's observation that "neither respondent nor the Court of Appeals ha[s] identified any case demonstrating a clearly established rule prohibiting the officer from acting as he did," *ante*, at 209, must be read in light of our previous caution that "the very action in question [need not have] previously been held unlawful" for a plaintiff to defeat qualified immunity, *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987).

695; see *Street* v. *Parham*, 929 F. 2d 537, 540 (CA10 1991) (describing excessive force case as one "where the determination of liability and the availability of qualified immunity depend on the same findings"). In other words, an officer who uses force that is objectively reasonable "in light of the facts and circumstances confronting [him]," *Graham*, 490 U. S., at 397, simultaneously meets the standard for qualified immunity, see *ante*, at 201, and the standard the Court set in *Graham* for a decision on the merits in his favor. Conversely, an officer whose conduct is objectively unreasonable under *Graham* should find no shelter under a sequential qualified immunity test.

Double counting "objective reasonableness," the Court appears to suggest, *ante*, at 200, is demanded by *Anderson*, which twice restated that qualified immunity shields the conduct of officialdom "across the board." 483 U. S., at 642, 645 (quoting *Harlow* v. *Fitzgerald*, 457 U. S. 800, 821 (1982) (Brennan, J., concurring)); see also *Anderson*, 483 U. S., at 643 ("we have been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated"). As I see it, however, excessive force cases are not meet for *Anderson*'s two-part test.

*Anderson* presented the question whether the particular search conducted without a warrant was supported by probable cause and exigent circumstances. The answer to such a question is often far from clear.[5] Law in the area is constantly evolving and, correspondingly, variously interpreted. As aptly observed by the Second Circuit, "even learned and experienced jurists have had difficulty in de-

---

[5] *Wilson* v. *Layne*, 526 U. S. 603 (1999), is a prototypical case. There, the Court accorded qualified immunity to police who permitted the media to accompany them on a search of a house. The constitutionality of the ride-along practice was unsettled at the time of the incident-in-suit in *Wilson*, and remained so until this Court spoke.

fining the rules that govern a determination of probable cause . . . . As he tries to find his way in this thicket, the police officer must not be held to act at his peril." *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 456 F. 2d 1339, 1348 (1972) (on remand). In this light, *Anderson* reasoned: "Law enforcement officers whose judgments in making these difficult determinations [whether particular searches or seizures comport with the Fourth Amendment] are objectively legally reasonable should no more be held personally liable in damages than should officials making *analogous determinations* in other areas of law." 483 U. S., at 644 (emphasis added).

As the foregoing discussion indicates, however, "excessive force" typically is not an "analogous determination." The constitutional issue whether an officer's use of force was reasonable in given circumstances routinely can be answered simply by following *Graham*'s directions. In inquiring, under *Graham*, whether an officer's use of force was within a range of reasonable options, the decisionmaker is also (and necessarily) answering the question whether a reasonable officer "could have believed" his use of force "to be lawful," *Anderson*, 483 U. S., at 638. See *Street*, 929 F. 2d, at 541, n. 2 (because of difficulty of deciding probable-cause issues, the conduct of an officer may be objectively reasonable even if cause did not exist, but "in excessive force cases, once a factfinder has determined that the force used was unnecessary under the circumstances, any question of objective reasonableness has also been foreclosed").

The Court fears that dispensing with the duplicative qualified immunity inquiry will mean "leaving the whole matter to the jury." *Ante*, at 200. Again, experience teaches otherwise. Lower courts, armed with *Graham*'s directions, have not shied away from granting summary judgment to defendant officials in Fourth Amendment excessive force cases where the challenged conduct is objectively reasonable based on relevant, undisputed facts. See, *e. g.*, *Wilson* v.

*Spain*, 209 F. 3d 713, 716 (CA8 2000) ("address[ing] in one fell swoop both [defendant's] qualified immunity and the merits of [plaintiff's] Fourth Amendment [excessive force] claim" and concluding officer's conduct was objectively reasonable in the circumstances, so summary judgment for officer was proper); *Roy*, 42 F. 3d, at 695 (under single objective reasonableness test, District Court properly granted summary judgment for defendant);[6] *Wardlaw* v. *Pickett*, 1 F. 3d 1297, 1303–1304 (CADC 1993) (same). Indeed, this very case, as I earlier explained, see *supra*, at 210–212, fits the summary judgment bill. Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official. And that is as it should be. When a plaintiff proffers evidence that the official subdued her with a chokehold even though she complied at all times with his orders, while the official proffers evidence that he used only stern words, a trial must be had. In such a case, the Court's two-step procedure is altogether inutile.

\*   \*   \*

For the reasons stated, I concur in the Court's judgment, but not in the two-step inquiry the Court has ordered. Once it has been determined that an officer violated the Fourth Amendment by using "objectively unreasonable" force as

---

[6] Upholding summary judgment for a police officer who shot an armed, intoxicated, belligerently behaving arrestee, the First Circuit in *Roy* elaborated: "[T]he Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. Decisions from this circuit and other circuits are consistent with that view. And in close cases, a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently." 42 F. 3d, at 695 (footnote omitted).

that term is explained in *Graham* v. *Connor*, there is simply no work for a qualified immunity inquiry to do.

JUSTICE SOUTER, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion, but would remand the case for application of the qualified immunity standard.