In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1139

Victor R. McNair and Tre K. McNair,

Plaintiffs-Appellants,

v.

Sean Coffey,

Defendant-Appellee.

On Remand from the
Supreme Court of the United States.

Submitted August 15, 2001--Decided January 29, 2002


  Before Cudahy, Coffey, and Easterbrook,
Circuit Judges.

  Easterbrook, Circuit Judge.  Frazell v.
Flanigan, 102 F.3d 877, 886-87 (7th Cir.
1996), held that, "once a jury has
determined under the Fourth Amendment
that the officer's conduct was
objectively unreasonable, that conclusion
necessarily resolves for immunity
purposes whether a reasonable officer
could have believed that his conduct was
lawful." Our initial decision in this
case followed Frazell and concluded that
a jury verdict in plaintiffs' favor on
their claim that defendant used excessive
force in arresting them precluded any
possibility of qualified immunity for the
arresting officer. McNair v. Coffey, 234
F.3d 352 (7th Cir. 2000). After Saucier
v. Katz, 121 S. Ct. 2151 (2001), held
that an officer may be immune from
damages even if the court has found him
liable under an entirely objective
approach applying a previously announced
rule of law, the Supreme Court remanded
this case to us for further
consideration. 121 S. Ct. 2545 (2001).
Plaintiffs contend that we should
maintain our position despite that
decision, but we conclude that it
requires a change in outcome as well as
analysis.

  Officer Coffey had probable cause to
believe that the McNair brothers had not

paid parking tickets, and he activated his cruiser's lights to pull them over. An arrest on this basis was proper. See Whren v. United States, 517 U.S. 806 (1996). Coffey also suspected them of drug trafficking, but of this he had nothing more than a suspicion that turned out to be unfounded. Despite seeing the cruiser's flashing lights, the McNairs did not pull over for some time. At trial they contended that they had delayed because they wanted to get out of an unsavory neighborhood before surrendering, but this reason is not relevant; people ordered to stop (on probable cause to arrest) must halt immediately; they cannot make their own decisions about when and where they will surrender. See Dye v. Wargo, 253 F.3d 296 (7th Cir. 2001); see also Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir. 1988) (en banc).

Because it was dark (after 5 p.m. on December 20), the neighborhood posed risks, and the McNairs did not immediately stop, Coffey called for backup. Given the risks entailed even in ordinary traffic stops, see Uniform Crime Reports: Law Enforcement Personnel Table 18 (2000) (94 officers killed in traffic stops between 1990 and 1998), this was a sensible decision. When the McNairs finally stopped, they were surrounded by eight squad cars and told to get out with their hands up; many officers leveled weapons at the McNairs. But they were not roughed up; matters were handled peaceably. Victor McNair (the driver) was issued citations for operating a vehicle with a suspended registration and for failing to stop when directed; both McNairs were released within an hour. The jury determined that Officer Coffey violated the fourth amendment by arranging for a show of force that was needlessly frightening; each plaintiff was awarded $5,000 to compensate for the shock and indignity of the situation. Neither in the district court nor on appeal did Coffey take issue with the jury's verdict; this uncontested finding, coupled with the holding of Frazell, led to the conclusion that Coffey could not receive qualified immunity.

According to Saucier, the first question whenever a public official asserts qualified immunity must be whether that official violated the Constitution at

all. 121 S. Ct. at 2155-56. The Court assumed, when writing Saucier, that this decision would be made before trial; it did not inquire what happens if the official concedes that his conduct was unconstitutional (as Coffey did, by not contesting the jury's verdict) and contends only that the right was not clearly established "in light of the specific context of the case". Id. at 2156. It is hard to see how these can be separated when the defendant's concession influences the inquiry. For the underlying constitutional question, made context-specific, must be something like: "Does an excessive show of force, as opposed to an excessive use of force, violate the fourth amendment when undertaken in a dangerous neighborhood after a suspect fails to surrender on demand?" Then the immunity question would be whether an affirmative answer to this question is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Ibid., quoting from Anderson v. Creighton, 483 U.S. 635, 640 (1987). It is hard to answer the latter question about a reasonable public official's understanding if the former question has been framed poorly, answered incorrectly, or, in this appeal, not posed in the first place. Yet Saucier insists that it be posed and answered.

We assume that the jury resolved all factual disputes in the McNairs' favor. Juries are not authorized, however, to determine the substance of the Constitution. Taken in the light most favorable to the verdict, the record shows an over-the-top response by the police department as an entity: too many cars, too many gun muzzles on display. It does not show that Officer Coffey directed this response or controlled the conduct of the other officers at the scene; to the extent the record speaks to the question, it shows that Coffey did no more than radio for backup. (He denied at his deposition having any control over the number of cars that would be sent or the other officers' conduct when they arrived, and the jury was not asked to determine whether this answer was truthful.)

Coffey was entitled to support from other police; the McNairs do not even argue that the fourth amendment requires

all arrests to be made without assistance. If the policy of the police department were to display or use excessive force, then the McNairs might have a claim under Monell v. New York Department of Social Services, 436 U.S. 658 (1978). But they do not argue that the department had such a policy, and Fitchburg, Wisconsin, the unincorporated area near Madison that employed Officer Coffey, has not been made a defendant. Thus only Coffey's actions matter, and with respect to these the most that could be said (taking all of the evidence in the light most favorable to the verdict) is that Coffey recognized that many other officers might answer his call, and that he did nothing to prevent them from surrounding the McNairs, drawing their weapons, and otherwise displaying force that under the circumstances was intimidating and frightening.

Yet nothing in the fourth amendment specifies how many officers may respond to a call. The number of officers is not independently a "seizure" of any kind. The McNairs were eventually stopped, and thus seized, compare California v. Hodari D., 499 U.S. 621 (1991), with Brower v. Inyo County, 489 U.S. 593 (1989), but that seizure was supported by probable cause, and the McNairs do not contend that its duration was excessive. Given Atwater v. Lago Vista, 532 U.S. 318 (2001), which holds that the Constitution tolerates full custodial arrests for fine-only offenses, no such contention could succeed. So the seizure is unexceptionable, and plaintiffs do not contest any kind of search.

There remains the possibility that a seizure reasonable at the outset may become "unreasonable" because implemented in a needlessly frightening manner. One must be careful of equating fright-inducing aspects with "unreasonableness," however. That approach comes uncomfortably close to overlaying a shocks-the-conscience standard of substantive due process on the objective standard of the fourth amendment. We did that in Gumz v. Morrissette, 772 F.2d 1395 (7th Cir. 1985), but overruled Gumz two years later after concluding that fourth amendment analysis should depend on an objective assessment of the officers' conduct, rather than a subjective assessment of the suspect's

reaction to that conduct. See Lester v. Chicago, 830 F.2d 706 (7th Cir. 1987). Accord, Graham v. Connor, 490 U.S. 386 (1989). Although Sacramento v. Lewis, 523 U.S. 833, 842-45 (1998), held that a shocks-the-conscience approach is appropriate when no seizure occurs, a seizure did take place in this case. Thus the fourth amendment supplies the right perspective. Plaintiffs recognize this; they do not make any substantive-due-process claim.

Viewing matters through the objective reasonableness standard, we conclude that, even taking the record in the light most favorable to the McNairs, a jury could not properly have found that Officer Coffey personally behaved unreasonably. Good practice may have called for sending fewer cars, the better to maintain patrol coverage throughout the jurisdiction, and good community relations may counsel leaving revolvers in their holsters unless necessary. But the Constitution does not displace state and local governments as the source of wise police practices, and it certainly does not fasten liability on individual officers who call for aid whenever too many colleagues respond. Just as police may order occupants out of their vehicles to promote safety in a traffic stop, see Pennsylvania v. Mimms, 434 U.S. 106 (1977); Maryland v. Wilson, 519 U.S. 408 (1997), and may take suspects into custody for trivial offenses, see Atwater, so they may call extra cars to the scene to ensure that violence does not erupt--especially after a suspect in a rough neighborhood refuses to stop when directed. Plaintiffs have not cited even one post-Graham decision holding that an excessive number of squad cars or drawn guns can violate the fourth amendment by giving fright or offense, if the seizure is supported by probable cause and otherwise reasonable. At least two--one from this circuit--hold that a simple display of force along these lines does not violate the fourth amendment. See Sharrar v. Fesling, 128 F.3d 810 (3d Cir. 1997); Wilkins v. May, 872 F.2d 190 (7th Cir. 1989). We have found only one contrary decision, Robinson v. Solano County, 218 F.3d 1030 (9th Cir. 2000), and this has been vacated on the grant of rehearing en banc, 229 F.3d 931 (9th Cir. 2000).

Our point is not that Coffey and the other officers necessarily behaved "reasonably" in the tort sense. State law might or might not have afforded the McNairs some remedy. Our point, rather, is that the fourth amendment does not duplicate the tort of negligent infliction of emotional distress, a source of civil liability developed at common law long after the Constitution's adoption. The Supreme Court has held that this tort should not be engrafted onto statutes enacted early in the last century. See, e.g., Consolidated Rail Corp. v. Gottshall, 512 U.S. 532 (1994) (no liability under the fela for emotional injury unless the victim also suffers physical injury). See also Aiello v. Providian Financial Corp., 239 F.3d 876 (7th Cir. 2001) (violation of the automatic stay in bankruptcy does not entitle the debtor to damages for emotional distress). Treating the fourth amendment as anticipating the torts of negligent and intentional infliction of emotional distress would have even less support. Graham, the Court's authoritative discussion of excessive force, repeatedly says or assumes that there cannot be excessive force without some force, referring variously to "physically abusive governmental conduct," 490 U.S. at 394, "physical force," id. at 391 n.5, and force "applied" to a suspect, id. at 392. The McNairs are not victims of "physically abusive governmental conduct."

The use of a swat team to make a traffic stop could have consequences under the fourth amendment. If, for example, a suspect's consent to search were prompted by fear that the officers would react violently to a refusal, then the consent would be deemed involuntary and set aside. If edgy officers opened fire, that too could lead to liability. But plaintiffs do not trace any search or other touching to Officer Coffey's radio call for backup. The seizure was lawful (because supported by probable cause). Although we do not foreclose the possibility that the circumstances of an arrest could become "unreasonable" without the application of physical force, nothing in the circumstances of this case approaches that line, so it is unnecessary to determine where it may be located. It is enough to say that a reasonable officer in Coffey's position

would not have understood that what he was doing violated the McNairs' rights under the fourth amendment and therefore cannot be required to pay damages. The district court reached this conclusion also, and its judgment is affirmed.

CUDAHY, Circuit Judge, concurring. As the majority points out, Saucier v. Katz, 121 S. Ct. 215 (2001), is a matrix that ill-fits the present case since one of the principal goals of Saucier is to avoid trials of constitutional claims barred by qualified immunity. Here the trial has already occurred but becomes a virtual nullity under the rules prescribed by Saucier as best as they can be implemented in this topsy-turvy situation. I am none too sure what Saucier requires here: whether a finding of qualified immunity will do or whether one may look behind the jury verdict, which Officer Coffey does not contest, to exculpate him entirely. Apart from the unappealed verdict, a finding that he did not violate the Constitution seems quite supportable. In that connection, Judge Coffey has performed a real service by attempting to reconstruct a detailed scenario of Officer Coffey's activities during the evening in question and by offering an interpretation of events from Officer Coffey's perspective.

I am troubled, however, by what seem to me to be ambiguities in the majority's treatment of displays (as opposed to the actual use) of force in relation to the strictures of the Fourth Amendment. Although the majority eventually concedes that "we do not foreclose the possibility that the circumstances of an arrest could become 'unreasonable' without the application of physical force," Slip Opinion, at 7, it elsewhere follows an unbroken course of minimizing this possibility. For example, at one point it states, "One must be careful of equating fright-inducing aspects with 'unreasonableness.'" Slip Opinion, at 5. This seems to me to be carrying the requirement of objectivity to an extreme. The mental state of the terrorized is at least one measure of the objective reasonableness of the terror applied. Physical injury is not a necessary element of a claim for excessive force. But the absence of

physical injury is an important circumstance in the totality of the circumstances measuring the reasonableness of the force displayed.

   In California v. Hodari D., 499 U.S. 621, 626 (1991), the Court held that an arrest requires either the use of physical force, or the submission to an assertion of authority. Thus, there can be no seizure unless the person seizedactually yields to a show of authority. See id. Hodari D. clarifies a line of Fourth Amendment cases that held that a seizure occurs when an officer restrains a suspect by a show of authority. See generally Graham v. Connor, 490 U.S. 386, 395, n. 10 (1989) (a "'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'") (citing Terry v. Ohio, 392 U.S. 1, 19, n.16 (1986)); INS v. Delgado, 466 U.S. 210, 215 (1984) (same); United States v. Mendenhall, 446 U.S. 544, 553 (1980) (adhering to "the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom is restrained"). Hodari D. requires, for the triggering of Fourth Amendment protection, that the suspect actually submit to the show of authority. Clearly, these cases make no distinction, as a matter of principle, between the use of physical force and its display, provided that the suspect submits.

   Seizures of persons must satisfy the reasonableness standard of the Fourth Amendment. See Graham v. Connor, 490 U.S. 386, 395 (1989) (holding that "all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). In determining whether a seizure is reasonable, the court must engage in an objective inquiry. See id. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). The absence of physical injury is clearly relevant to the determination whether the use or display

of force is constitutionally excessive. See Gumz v. Morrissette, 772 F.2d 1395, 1401 (7th Cir. 1985) (noting that "the presence of some physical evidence is certainly relevant" to the determination whether the use of force was constitutionally excessive), overruled on other grounds by Lester v. City of Chicago, 830 F.2d 706 (7th Cir. 1989); Sharrar v. Fesling, 128 F.3d 810 (3d Cir. 1997) (extending Gumz's rationale to an excessive display of force claim).

Sharrar, which involved perhaps the most frightening show of force of any reported case, still does not support the proposition that there can be no excessive force without physical injury. In Sharrar, the plaintiffs were arrested by a SWAT team which displayed a threat of force and used extreme tactics (that did not result in physical injury to three of the victims). See 128 F.3d at 821. Analyzing the case under Graham's objective reasonableness standard, the majority held that the extreme measures did not rise to the level of a constitutional violation. Id. The Sharrar court, however, did note that the case was a close one, implying, of course, that a contrary outcome was not foreclosed. See id. at 822./1 And, this observation is certainly incompatible with any suggestion that a display of force that does not result in physical injury could in principle never violate the Fourth Amendment. Further, the Sharrar court explicitly stated that it did not agree that "the absence of physical injury necessarily signifies that the force [used] has not been excessive." Id. And the court noted that, "Although there are decisions of this court that found the use of force excessive, notwithstanding the absence of extensive physical contact and permanent physical injury, the circumstances here are distinguishable." Id. at 821. Therefore, it would be incorrect to dismiss the present circumstances entirely on the basis that they merely involve a display of force without physical impact.

In any event, as I have suggested, it is not clear exactly how Saucier should be applied to the present facts but the plausible interpretation employed here points to affirmance of the judgment.

FOOTNOTE

/1 The dissent in Sharrar disagreed only with this
holding, arguing that if the case went to trial,
a jury could find that the use of the SWAT team
was objectively unreasonable. See 128 F.3d at
832-33.



   COFFEY, Circuit Judge, concurring in judgment and
dissenting in part./1

I.   INTRODUCTION

   This case has an extended procedural history.
Two African-American brothers, Victor and Tre
McNair, brought suit in the Circuit Court of Dane
County in February 1999, alleging that Officer
Sean Coffey of the Fitchburg Police Department
practiced racial discrimination; committed the
torts of assault, battery, and false
imprisonment; and deprived them of their Fourth
Amendment rights by initiating a traffic stop of
their vehicle on December 20, 1997. After Coffey
removed this case to federal court, the McNairs
voluntarily dismissed their claim of
discrimination, and Coffey thereafter moved for
summary judgment on the claim of excessive force,
raising the defense of qualified immunity./2

   The qualified immunity motion was denied, and
this case went to trial in early November 1999.
On two occasions during trial, Coffey again
raised the defense of qualified immunity--in a
motion for directed verdict following the
plaintiffs' case/3 and in a motion for directed
verdict following the close of all evidence at
the trial/4--arguing that the facts taken in the
light most favorable to the McNair brothers were
insufficient to sustain a jury's finding that he
violated the Fourth Amendment and could not have
reasonably believed that his conduct was lawful.
These motions also were denied. Following five
hours of deliberation, the jury found in favor of
Officer Coffey on the claims of assault, battery,
and false imprisonment, but found in favor of the
McNairs on their claim of excessive force. The
jury awarded each of the plaintiffs $5,000, for
a total of $10,000 in compensatory damages.

   Seven days after the jury verdict, Coffey filed
a motion to alter or amend the judgment, again
raising the issue of qualified immunity--this for
the fourth time./5 The trial judge granted the
motion. The McNairs appealed to the U.S. Court of
Appeals for the Seventh Circuit, and a panel of
the court reversed the district judge, quoting
and following the holding of Frazell v. Flanigan,

102 F.3d 877, 886-87 (7th Cir. 1996), reasoning that "once a jury has determined under the Fourth Amendment that the officer's conduct was objectively unreasonable, that conclusion necessarily resolves for immunity purposes whether a reasonable officer could have believed that his conduct was lawful." McNair I, 234 F.3d 352, 355 (7th Cir. 2000). Thereafter, Coffey filed a petition for a writ of certiorari with the Supreme Court of the United States. Afterconsideration, the Court granted the writ and returned this matter to the appellate court on remand "for further consideration in light of Saucier v. Katz," a case which reversed a Ninth Circuit decision employing the same reasoning as our opinion in Frazell. The Saucier Court stated, in pertinent part, as follows:

A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.

121 S.Ct. 2151, 2156 (2001).

In the penultimate sentence of its opinion, the majority in this case overturns the decision in McNair I and seems to hold that Officer Coffey is entitled to qualified immunity because "a reasonable officer in Coffey's position would not have understood that what he was doing violated the McNairs' rights" under the Fourth Amendment. The majority, by drawing attention to whether Coffey believed he was acting within the boundaries of the law, suggests by its very language that Coffey is entitled to qualified immunity because the law was unsettled at the time of his conduct, and thus implies that Coffey did violate the Fourth Amendment.

I agree with the majority's decision only insofar that the jury's verdict must be set aside. However, I believe, unlike the majority, that the Supreme Court has made it clear in their remand and directed us to undertake a thoroughreview of the record. Upon review, I would dismiss this case on the basis that the McNairs failed to establish that Officer Coffey's conduct violated their constitutional rights, despite the jury verdict to the contrary. I am convinced, as a matter of law, that the McNairs failed to produce sufficient evidence to warrant submitting their Fourth Amendment claims to the jury in the first instance. We in McNair I should

have ended our inquiry there. Accordingly, while I concur in the judgment of this court, my decision rests on grounds other than those stated by the majority. I am forced to write separately because I believe that our prior decision in McNair I, as well as the majority opinion, fails to recite facts sufficient to sustain our holding, misstates important aspects of the record, and misconstrues relevant case law concerning the extent of the Fourth Amendment's protection against unreasonable seizures. Therefore, I must respectfully dissent from certain portions of the majority opinion.

My concurrence and dissent addresses two issues. First, in Part II of this opinion, I analyze the McNairs' excessive force claim in light of the rich factual record, which establishes that Officer Coffey and other patrolmen in the same position would have reasonably believed that the McNairs were a risk to the officers as well as the general public. I explain that Officer Coffey cannot personally be held responsible for the display of force made by the law enforcement officers from Fitchburg or the other jurisdictions, who responded to his call for backup assistance, any more than he would be responsible for a misdeed by one of the officers while on the scene, because the actions of these other patrolmen were beyond his control. I then conclude that, in any event, this simple display of force was a reasonable response to the potentially dangerous safety risk posed by the McNairs. Accordingly, I am convinced that the display of force and the subsequent seizure of the McNair brothers was accomplished within the parameters of the United States Constitution and not in violation thereof.

Then, in Part III, I respectfully dissent from the majority's suggestion that plaintiffs alleging excessive force cannot prevail on a Fourth Amendment claim if they "are not victims of physically abusive governmental conduct."/6 Ante at 7. I am of the opinion that this is an overbroad statement of the law. I agree with the proposition that, if a suspect is apprehended without suffering any physical injuries, it is likely that the police acted reasonably. However, as I explain more fully later in this opinion, post at 40-41, at least two cases from this Circuit--including one written by the author of the majority opinion--support the proposition that a seizure resulting from an alleged excessive display of force, standing alone, might possibly violate the Fourth Amendment. See United States v. Jones, 214 F.3d 836 (7th Cir. 2000); Williams v. O'Banner, 1997 U.S. Dist. LEXIS 6873, 1997 WL 264361 (N.D. Ill. 1997).

## II.  THE MCNAIRS' FOURTH AMENDMENT CLAIM

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier, 121 S.Ct. at 2156 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). This right "is effectively lost if a case is erroneously permitted to go to trial." Id.

As noted previously, on three separate occasions prior to the jury verdict--(1) in a motion for summary judgment; (2) in a motion for directed verdict following the plaintiffs' case; and (3) in a motion for directed verdict following the close of all evidence--Coffey raised the defense of qualified immunity, arguing that the facts taken in the light most favorable to the McNair brothers were insufficient to sustain a jury's finding that he violated the Fourth Amendment and could not have reasonably believed that his con duct was lawful. The district court denied each of these motions only to grant Coffey's post-verdict Motion To Alter Or Amend Judgment on the basis that "a reasonable police officer could have believed that the high risk procedure Defendant Officer Coffey used was lawful based on the law [in existence] when force was [displayed] in this case." (Doc. No. 103 at 6.)

As explained previously, although Coffey's motion for summary judgment, based on qualified immunity, explicitly argued that, "if the court were to rule that Officer Coffey's actions may somehow have violated the plaintiffs' Fourth Amendment rights, it could not be fairly said that a reasonable police officer in his position would have known that his conduct was forbidden by law," (Doc. No. 34 at 15), the trial judge denied the motion on the basis that the presence of "factual disputes concerning the defendant's conduct" precluded summary judgment. (Doc. No. 55 at 8.) Yet the law was equally settled before and after trial; likewise, my review of the record convinces me that the proposed finding of facts submitted by Coffey at summary judgment, and undisputed by the McNairs, were identical to the material facts developed at trial./7 It is difficult, therefore, to reconcile the judge's decision before trial to deny the motion for qualified immunity with his decision after trial to grant the motion for qualified immunity notwithstanding the jury verdict. Indeed, if we are to preserve the fundamental benefit that qualified immunity confers on governmental officials performing the difficult task of navigating the hazy borders between permissible and impermissible activity, i.e., avoiding the burdens of needless litigation and trial, we are compelled to observe that the trial judge erred by failing to grant Officer Coffey's motion for

summary judgment and dismiss this case more than two years ago. See Egebergh v. Nicholson, 272 F.3d 925, 927 (7th Cir. 2001) (police officers "are entitled to immunity before trial . . . if the facts are construed as favorably to the plaintiff as the record permits, [and] they still are entitled to immunity-- in which event they shouldn't be put to the burden of a trial that might cast the facts in a light unnecessarily more favorable to them.")

A.  The Issue and Standard of Review

   After granting Officer Coffey's writ of certiorari, the Supreme Court vacated our prior opinion and remanded this case "for further consideration in light of Saucier v. Katz, 121 S.Ct. 2151 (2001)." 121 S.Ct. 2545 (2001). Saucier, in turn, states as follows:

In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. . . . Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. . . . A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question of whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

121 S.Ct. at 2155-56 (internal citations omitted; emphasis supplied).

   Thus, Saucier directs us to ask whether Coffey's conduct, viewed in the light most favorable to the jury verdict, rises to the level of a Fourth Amendment violation as a matter of constitutional law. Only if this initial question is answered in the affirmative are we to consider whether a law enforcement officer in Coffey's position on December 20, 1997 would, nevertheless, have reasonably believed that his conduct was lawful./8 Id. at 2156. Yet the

majority opinion fails to answer the first question that Saucier requires us to ask. The majority contends that Coffey did not "take issue with the jury's verdict" and, therefore, "concedes that his conduct was unconstitutional." Ante at 3. This statement is confusing. I wish to emphasize that on three separate occasions prior to the verdict--(1) in a motion for summary judgment; (2) in a motion for directed verdict following the plaintiffs' case; and (3) in a motion for directed verdict following the close of all evidence--Coffey did argue that his display of force was protected by the Fourth Amendment, even if all of the McNairs' evidence was accepted as true. Thus, because I am: (1) mindful of the fact that Coffey has adequately preserved his right to challenge the legal sufficiency of the jury verdict against him; (2) cognizant of our discretionary authority to review the entire record; (3) obligated by Saucier to clarify the boundaries of the law by considering in every instance whether "the facts alleged show the officer's conduct violated a constitutional right," 121 S.Ct. at 2156; and (4) instructed by the Court to review this case in light of Saucier, I am prepared to answer the question "head on" of whether the McNair brothers were the subject of an unreasonable seizure. Conducting such an analysis complies with the Saucier Court's ultimate goal of establishing legal principles that remove uncertainty in the case law, guiding public officials in their daily conduct, and protecting all but the plainly incompetent or those who knowingly break the law from future nettlesome lawsuits.

Indeed, although the district court dismissed this case on the basis of qualified immunity, I believe the more proper course in this instance is to set aside the verdict on the independent, clear, and more compelling basis of the insufficiency of the evidence. Qualified immunity is an appropriate and accepted method for disposing of cases prior to trial, rather than after trial, because "the denial of a qualified immunity defense is the only procedural vehicle a defendant can use to bring to us at the pretrial stage, instead of after final judgment, any question relating to the merits." Hartley v. Parnell, 193 F.3d 1263, 1271 (11th Cir. 1999). Conversely, because the advantage of qualified immunity is "effectively lost if a case is erroneously permitted to go to trial," Mitchell, 472 U.S. at 526, qualified immunity in the context of a trial is indistinguishable from other affirmative defenses that come into play only if the plaintiff establishes that the defendant has violated his rights.

Thus, it is a non-sequitur for us at the late

stage of this litigation to cloak our decision in the language of immunity. When considering Coffey's post-verdict motion, I am convinced that we should use the same legal analysis as other cases, with the initial inquiry being whether there were sufficient facts to support the verdict rendered, in light of the applicable law. I agree that if the facts substantiated the view that Coffey violated the Constitution, then the proper recourse would be through the doctrine of immunity. But because his actions were reasonable in the first instance, he is entitled to a ruling that affirmatively characterizes his conduct as lawful and prudent, without any discussion of a defense that implies the existence of a valid antecedent claim against him. See Hartley, 193 F.3d at 1273-74 (Hoeveler, J., concurring). Based on the law of the land and my review of the evidence adduced at trial, I agree with the law enforcement officer that this case should never have gone to trial and, furthermore, should never have been submitted to the jury. See Egebergh, 272 F.3d at 926-27.

Our inquiry is whether the record contains a legally sufficient evidentiary basis from which a jury could have reasonably derived its verdict. In doing so, we must consider the entire record, without reweighing the evidence or judging the credibility of the witnesses. Tice v. Lampert Yards, Inc., 761 F.2d 1210, 1213 (7th Cir. 1985). Sitting as an appellate tribunal, we assume that the jury resolved all genuine factual disputes in favor of the McNairs, id., but at the same time, as I read the law, we cannot ignore the court record containing unequivocal, undisputed, andunimpeached evidence that is favorable to Officer Coffey and relevant to the legal sufficiency of the McNairs' case. See McGee v. Bauer, 956 F.2d 730, 735-36 (7th Cir. 1992) (reversing jury award; dismissing case on the basis of undisputed facts and the court's independent determination of the scope of the Procedural Due Process Clause); see also Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 216 (1931) (jury is not "at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt."); Ford v. Childers, 855 F.2d 1271, 1274 n.4 (7th Cir. 1988) (en banc). Even after drawing inferences in the light most favorable to the verdict, I am convinced, as a matter of law, that Officer Coffey's conduct did not violate the Constitution.

B.   Verdict Forms and Interrogatories in Qualified Immunity Cases

Before reviewing the evidence, however, I must

pause and comment upon how defense counsel's unorthodox strategy prejudiced Officer Coffey and complicated our review of this case on appeal. In cases of this nature, defense counsel is responsible for timely preparing and presenting proper interrogatories for the trial judge to submit to the jury. Sadly, defense counsel failed to supply the trial judge with instructions and specific factual interrogatories related to the material contested facts presented at trial. See Fed. R. Civ. P. 49(b). Instead, both parties took the easy but fatal way out (to the detriment of the jury's deliberative process) and presented the trial judge with only a general verdict form containing the following question: "Did Defendant Sean Coffey use excessive force during the course of the December 20, 1997 traffic stop of Plaintiff Victor McNair [and Plaintiff Tre McNair], which deprived [them] of [their] Fourth Amendment right[s] to be free from unreasonable seizure?" Counsel neglected to object to the verdict form's amorphous question, which improperly invited the jury to usurp the role of the court and resolve constitutional issues in the form of a legal conclusion devoid of reference to specific facts, i.e., what constitutes the precise amount of force that may be displayed in response to the circumstances surrounding the safety risk Coffey reasonablybelieved to have been posed by the McNairs to the police and the public at large. See McGee, 956 F.2d at 735.

It is a basic premise of our legal system that juries are the triers of fact only; it is for the judge, not the jury, to interpret the law and to draw the line in the sand separating conduct that is protected and unprotected under the Constitution. In other words, the plaintiff must convince the court that the facts found by the jury are sufficient to trigger the protections of the Fourth Amendment as a matter of law. See id. at 735-36.

This case presents an issue similar to that in McGee, which involved the Due Process Clause of the Fourteenth Amendment. Plaintiff McGee alleged a due process violation when a building inspector posted a sign declaring McGee's house uninhabitable without having previously offered him the right to participate in a hearing. We found error with the trial court's limited jury instruction that McGee was entitled to damages if the jury was convinced that he was deprived of his property without due process of law. See id. at 735 ("[t]he jury was instructed that McGee should prevail . . . if he proved . . . [t]hat the alleged deprivation occurred without due process of law.") We held that this instruction was impermissible because it "essentially asked

the jury to decide what process McGee was due in regards to the alleged deprivation." Id. Jurors without the benefit of legal education, training and experience are not expected to be qualified to interpret a constitutional question dealing with the precise substantive guarantees of the Due Process Clause. We stated that "[w]hat process is due under the Constitution is a legal question that the judge should resolve. The judge then should put to the jury any factual questions relating to the application of that standard. The jury's conclusion that McGee did not receive 'due process of law' does not inform our analysis of what process was due." Id.

Certainly, the reasoning of McGee applies to the facts in the case before us. During the trial, the McNairs raised a constitutional issue, alleging an excessive display of force. At the close of the McNairs' case, upon proper motion and with the aid of respective counsel, the trial judge was obligated to initially inquire whether the plaintiffs produced any facts sufficient to allow a jury to determine whether Patrolman Coffey violated their Fourth Amendment rights. Before sending the case to the jury, and after taking into consideration the facts and the law applicable thereto, the attorneys were obligated to submit, and the court was likewise obligated to present the jury with special interrogatories that would have then allowed the court to: (1) understand what precisely occurred on December 20, 1997; and (2) determine, in light of those particular findings and the applicable law, whether such a violation in fact occurred. See Rakovich v. Wade, 850 F.2d 1180, 1202 n.15 (7th Cir. 1987) (en banc); Gros v. Port Washington Police Dist., 944 F. Supp. 1072, 1084 (E.D.N.Y. 1996) ("[u]nresolved factual questions bearing on qualified immunity should be decided . . . on special interrogatories.")

Here, the issue is whether the McNairs proved at trial that Officer Coffey displayed excessive force. As previously discussed, after resting their cases, the parties should have provided the trial judge with special interrogatories and requests that the jurors be instructed, prior to their deliberations, that the parties agreed that Officer Coffey was the sole patrolman on duty, seated in his car in the dark of winter around 5:30 p.m., in an area stipulated to as having a high crime rate, including drug trafficking; and that Officer Coffey encountered the McNairs among a group of three other individuals standing on a street corner near an apartment known to be the site of illegal drug activity. (Appellants' Br. at 6-7; Appellee's Br. at 1-3.) See 9A Wright & Miller, Federal Practice & Procedure sec. 2506 at 174-76 (1995) (discussing jury instructions

related to undisputed facts). Then, the specific questions asked of the jury should have included, but not necessarily been limited to: "According to the evidence presented, would a patrolman in Officer Coffey's position have reasonably believed that: (1) the McNairs and this crowd dispersed shortly after seeing Officer Coffey's police vehicle, with some members of the group retreating towards the apartment?; (2) a third suspect may have been present in the McNair vehicle outside Coffey's field of vision?; (3) the McNairs should have seen and heard Coffey's emergency lights and sirens, yet disregarded these observations and continued driving for one mile or more?; (4) the McNairs pulled into a gas station lot, where customers were present, which was within walking distance of a residential neighborhood?; and (5) furthermore, as a result of their seizure, did the McNairs suffer any physical injuries while they were detained for approximately one hour for questioning?" The jury's responses then should have served as the basis for the district judge's determination of whether Officer Coffey's actions were reasonable as a matter of constitutional law. See Rakovich, 850 F.2d at 1202 n.15; 9A Wright & Miller, supra sec.sec. 2511-13 at 217-35.

Because of defense counsel's failure to request, much less tender any proposed special interrogatories to the trial judge, the jury was improperly instructed and ill-informed. Nevertheless, I cannot agree with the wild-eyed speculation and supposition offered by plaintiffs' counsel that the McNairs must prevail because the jury necessarily determined that "a reasonable officer would never have believed the McNairs were drug dealers or posed any sort of threat." (Appellants' Rule 54 Stmt. at 5 n.5.) Counsel's argument is misdirected in at least two respects. First, although counsel sets up a strawman, i.e., his drug dealer argument, and proceeds to flail away at it, the dispositive issue is not whether the McNairs were drug dealers. Rather, the controlling question is whether Officer Coffey acted reasonably at the time, in light of his knowledge, information,experience, and perceptions of the seriousness of the totality of the circumstances confronting him. Saucier, 121 S.Ct. at 2155-56; Smith v. City of Chicago, 242 F.3d 737, 743-44 (7th Cir. 2001). In addition, as I stated earlier, the jury's conclusion that Coffey used "excessive force" must be supported with specific evidence offered at trial. To the extent that undisputed and unimpeached evidence established material facts showing, as a matter of law, that Officer Coffey was justified in his belief that the McNairs posed a risk to himself and to the community, the uninformed jury's finding that

Coffey violated the Fourth Amendment, in response to the inane, sweeping question, "Did Defendant Sean Coffey use excessive force during the course of the December 20, 1997 traffic stop of Plaintiff Victor McNair [and Plaintiff Tre McNair], which deprived [them] of [their] Fourth Amendment right[s] to be free from unreasonable seizure?", is useless and highly prejudicial to Officer Coffey. See McGee, 956 F.2d at 735-36; Dual Mfg. & Eng'g v. Burris Indus., 619 F.2d 660, 667 (7th Cir. 1980) (en banc).

C.   The Search and Seizure Clause

Turning to the merits, the Fourth Amendment protects citizens against unreasonable searches and seizures. Police may seize a person only if there is probable cause. The power to seize "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," Graham v. Connor, 490 U.S. 386, 396 (1989), and "[f]ollowing Graham, we analyze all excessive force claims stemming from an arrest or other seizure by the police under a Fourth Amendment 'objective reasonableness' standard." Ellis v. Wynalda, 999 F.2d 243, 246 (7th Cir. 1993).

The Graham analysis focuses on whether the officer's actions were objectively reasonable "in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Graham, 490 U.S. at 397. We must place ourselves in the shoes of the patrolman at the time he made the decision to call for backup assistance, in light of his knowledge, experience, and perception of the possibly volatile situation confronting him. Sherrod v. Berry, 856 F.2d 802, 804-05 (7th Cir. 1988) (en banc). We judge the reasonableness of his actions based upon the information he possessed at the time, rather than with the 20/20 vision of hindsight. Id. We balance the amount of forcedisplayed against the danger posed to the arresting officer and the community if the suspect resists or flees. McDonald v. Haskins, 966 F.2d 292, 294 (7th Cir. 1992). Among therelevant factors to consider are the nature of the crime for which the suspect is being pursued, the threat posed to the safety of the officers and to the community, and whether the suspect is actively resisting or attempting to evade arrest by flight. Graham, 490 U.S. at 396; post at 42. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. Moreover, "[n]ot every push

or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. at 396.

Officer Coffey was the sole law enforcement officer on the scene. I believe that overwhelming material evidence, almost none of which is disputed, established at trial that Coffey--as any reasonable officer would do in like circumstances--would have called for backup assistance at a time when he had reason to believe the McNairs posed a serious risk to himself and to the general public. Furthermore, based on the record before me, it is patently obvious that Coffey's decision to call for backup assistance, which resulted in the display of force objected to in the arrest of the McNairs, was eminently reasonable. I review this evidence to add to the majority's brief recitation of facts and to make clear the reasonableness of Coffey's actions. I then explain why I conclude, from my discretionary review of the record, that Officer Coffey did not violate the McNairs' Fourth Amendment rights.

1. The McNairs were a risk to Officer Coffey and the general public

On the night of December 20, 1997, Officer Sean Coffey had been a law enforcement officer for approximately 2 years. He was routinely assigned to the Allied-Dunns Marsh neighborhood in the community of Fitchburg, Wis., which is neither a village, town nor city, but, rather, is an unincorporated area of 18,000 people adjoining the city of Madison, Wis. Even the McNairs concede that Coffey correctly perceived that the area around Rosenberry Road and Thurston Lane in Fitchburg is an undesirable area, with a crime rate that is higher than normal, that has been the site of "armed robberies, burglaries, damage to property," "person crimes, batteries, assaults," and "a lot of drug activity." (Tr. 2-140.) Indeed, in the plaintiffs' own words, "[d]rug dealing and other criminal activity is known to have occurred in the neighborhood." (Appellants' Br. at 6.) This troubling situation occurred between 5 and 5:30 p.m. in the dark of winter. The streetlights were activated and the black shadows of night had long past set.

Coffey was parked in an empty parking lot across the street from the location where he first sighted the people later identified as the McNair brothers, Victor and Tre. As he was looking out onto Thurston Lane, observing the traffic and keeping tabs on the activity in the area, he noticed a Mitsubishi Galant vehicle parked at the curb. Coffey, while seated as the sole occupant in his squad car, observed at least

five young people standing on the sidewalk, apparently looking at this automobile. Coffey decided to investigate the scene and then drove alongside the people and the automobile. As he did so, at least two or three individuals standing on the sidewalk departed the area and proceeded towards an apartment known to be a site of illegal drug activity on the corner of Thurston and Rosenberry. Coffey stated that he believed he saw the McNair brothers and a third person enter the Mitsubishi and proceed to drive off in the opposite direction of the squad car. Coffey stated that the congregation of people on a street corner in this crime-prone area of Fitchburg, accompanied by the almost immediate dispersal of several men towards the apartment after they had in all probability sighted his squad car, made him suspicious as to whether there was possible illegal drug activity afoot. (Tr. 2-50, 2-89; Appellee's Br. at 2-3.)

Coffey decided to pursue the McNair car. He radioed the Fitchburg police headquarters and asked the dispatcher for an owner and license plate I.D., to ascertain whether the legal owner resided in the immediate area, and if he had any outstanding warrants or a prior police record. As the vehicle continued to travel for several hundred feet along the frontage road towards an on-ramp for the Madison Beltline expressway, there was but one vehicle between the Mitsubishi and Coffey's police vehicle. The dispatcher responded and advised that the vehicle belonged to a Victor McNair and that its state motor vehicle registration was suspended for unpaid traffic citations. At this point, after receiving this information, Coffey had probable cause to stop the vehicle. See Wis. Stat. sec. 346.04(1).

Once the car made its way to the top of the on-ramp, and was rapidly approaching the expressway, Coffey maneuvered his squad car so that he was immediately behind the McNair vehicle. At this time, Coffey activated his emergency lights, hoping to direct the McNairs to pull over, and also activated the video camera positioned on top of his police car. The McNairs refused to comply with the officer's signal and instead continued driving for an unspecified distance at about 55 mph, keeping up with the flow of traffic. After another five or six seconds while the suspects' refused to obey a lawful command by a police officer, Coffey turned on his emergency siren. The traffic was normal, and Officer Coffey was close enough behind the vehicle to allow him to form the opinion, based on his knowledge, experience, and perceptions at the time, that the McNairs could readily hear his siren and see the flashing, colored overhead lights. Indeed, as the videotape of the chase reflects, at least one

vehicle can be observed pulling over to the side of the road, with its blinkers on, pursuant to law. Moreover, while on the Beltline, other cars traveling in the same direction were observed moving over to the traffic lane furthest from Officer Coffey's squad car, thus suggesting that other vehicles in the immediate area also heard and saw the police sirens and lights.

   Under this escalating and evolving scenario, I am convinced that Coffey must have been reasonably concerned for his safety and what lie ahead of him as he proceeded to make a valid arrest of a fleeing suspect. Coffey testified that he thought he saw three people enter the Mitsubishi when it was parked on Thurston and Rosenberry, but from his observation of the occupants of the car during this pursuit, he was able to observe the silhouettes of only two individuals. He testified that he believed the third person might have crouched down below the rear window vision line, attempting either to obtain a weapon or possibly secrete drugs or drug paraphernalia. I believe that Coffey's fears were well-founded: the police are trained to assume that a person who conceals himself from view may well be doing so to establish an advantage in an attempt to overpower or ambush an approaching officer. (Tr. 2-153 to -154.)

   The situation with the fleeing suspects continued to deteriorate, as the McNairs persisted for almost another mile along the Beltline highway in their attempted flight from the officer, despite the squad car's flashing lights and blaring sirens directing them to pull over, before they finally exited onto an off-ramp. Because the McNairs refused to stop in a timely fashion, it was reasonable for the officer to assume that they were fleeing in an attempt to avoid arrest. In addition, Coffey gave undisputed testimony that, while an individual apprehended on the highway is somewhat constrained by speeding traffic and concrete barriers, a suspect who pulls over in a residential area is able to flee on foot much more easily, should he be so inclined. (Id.) For these reasons, I believe it is, at best, improper to state, as plaintiffs' naive counsel does, that Officer Coffey was effectuating a routine traffic stop and could not have "reasonably believed the McNairs . . . were trying to evade or elude him." (Appellants' Br. at 20.) As the Supreme Court explained in California v. Hodari D., 499 U.S. 621 (1991), we know from "proverbial common sense" that the ordinary law-abiding citizen yields upon a policeman's lawful order to halt. Id. at 623 n.1; see also Mays v. City of E. St. Louis, 123 F.3d 999, 1003 (7th Cir. 1997) ("if police are forbidden to pursue, then many more suspects will

flee--and successful flights not only reduce the number of crimes solved but also create their own risks for passengers and bystanders.")

After leaving the expressway, the McNair car proceeded along the frontage road. Since the operator of the vehicle failed to stop within a reasonable distance, Coffey radioed his Fitchburg headquarters and advised that he was switching over to the Dane County police network to request additional officer support from other nearby municipalities. Fitchburg is an unincorporated area with a very small police force, suffering from financial problems and insufficient law enforcement personnel to handle a possibly dangerous and violent situation of this nature. There is no evidence in this record to suggest that Coffey knew how many officers from nearby municipalities would hear his call for assistance, much less respond to it. If the officers were preoccupied on other assigned police duties within their respective jurisdictions, or off-call during the relevant time period, they would not be able to respond to a request for help. Coffey, who was working alone, without a partner, radioed for a "10-80" when the McNairs pulled off the Beltline and began traveling down the off-ramp. A 10-80 is a police procedure referred to as a "high-risk vehicle contact." In other words, it means the requesting officer believes that he is involved in a dangerous situation that requires backup assistance. The record reflects that Coffey has called for 10-80 assistance only in dire situations. Indeed, Coffey testified that, while he has handled hundreds of traffic stops in the past, he has radioed for 10-80 assistance no more than four times in his entire career. (Tr. 2-152.)

The McNair vehicle continued along the frontage road for several tenths of a mile, approaching a Citgo gas station soon after Coffey made his request for backup assistance. Shortly thereafter, the auto decelerated and signaled the driver's intention to turn into the station. The McNairs entered the station's small lot, which was occupied by other vehicles and customers. The McNairs pulled up adjacent to one of the gas pumps, immediately adjacent to others pumping gas. Coffey testified that he pulled in directly behind the McNair vehicle. There was reason to be concerned about the safety of the bystanders in the congested lot and the nearby residential neighborhood, because if the suspects attempted to escape, misdirected gun shots might strike innocent civilians or possibly ignite any flammable liquids in the vicinity.

I share Officer Coffey's concerns about police

and public safety. I am convinced that Coffey, on single assignment without a partner, had more than sufficient information, knowledge, and experience (2 years on the force) to be concerned and believe that the McNairs posed an immediate threat to his own safety as well as the general public. To review, from Coffey's perspective, the McNairs behaved somewhat suspiciously on Thurston Lane when they were first observed mulling around with a crowd of people in a high-crime area after dark, with a known drug apartment a mere stone's throw away; they exhibited behavior consistent with illegal drug activity; they were operating a motor vehicle on a public highway in violation of state law; they disobeyed lawful directions, thus requiring the officer to pursue them for over a mile in his squad car with its emergency lights on and the siren blasting away; there was possibly a third passenger hiding somewhere in the vehicle with them, outside Coffey's line of vision; and when the fleeing suspects finally did pull over, they drove into a crowded gas station adjoining a residential area, where unsuspecting, law-abiding customers and homeowners could be harmed and definitely placed in a lethal situation if the suspects persisted in their attempt to flee and violence erupted.

It is important to note that between 1990 and 1999, a total of 6,048 law enforcement officers were assaulted, and 94 were killed, at the scene of a traffic stop or during a traffic pursuit. FBI Uniform Crime Reports, Law Enforcement Personnel, tbls. 18, 38 (2000). We have previously stated that proper respect for these statistics "underscore[s] our reluctance to second-guess an officer's split-second judgment" when faced with potentially explosive situations. Sherrod, 856 F.2d at 807 n.2 (en banc). In the same vein, we have described it as "beyond dispute that drug traffickers are often armed and dangerous and that they sometimes shoot policemen." United States v. Ocampo, 890 F.2d 1363, 1369 (7th Cir. 1989). Such precedent, coupled with the aforementioned facts, justifies Officer Coffey's testimony that the McNairs and another person may have been involved in drug activity and may very well have been armed and dangerous. It is irrelevant, of course, that Coffey's beliefs ultimately proved to be in error; the reasonableness of Coffey's decision to call for additional backup assistance "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

Moreover, even were I to accept Plaintiffs' argument that the jury concluded that Coffey had no reason to suspect that the McNairs were

trafficking narcotics, and also discredited Coffey's testimony about his belief that a third individual was hiding in their vehicle, two crucial undisputed facts remain. First, from his position alone in the squad car, Coffey saw the McNairs in the dark of a winter night talking to a group of people in a high-crime area in the immediate vicinity of a known drug house. Within seconds after seeing Coffey in his police vehicle, the McNairs departed the scene and several of the remaining bystanders retreated towards the house. Under these circumstances, such unprovoked flight upon noticing the police produces reasonable suspicion that some type of criminal activity involving the McNairs may have been afoot. Illinois v. Wardlow, 528 U.S. 119 (2000). Second, the McNairs' subsequent, prolonged, and unabated flight in the face of the existence of probable cause raises alarm in and of itself. It is of no consequence that the McNairs claim to have been driving away from Coffey because they wanted to pull over in a well-lighted area; Coffey had no way to know the McNairs' intentions./9 (Tr. 2-57 to -58.) Moreover, law-abiding, responsible motorists do not disregard signals from police vehicles unless they are trying to avoid apprehension, and, should they choose to do so, "no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." Sherrod, 856 F.2d at 805 (en banc).

2. Officer Coffey's display of force was reasonable

Once the McNairs stopped at the gas station, Coffey's personal involvement in the arrest was limited to: instructing the suspects over the loudspeaker to place their hands on the roof on the inside of the car; ordering the nearby customers pumping gas to clear the immediate area; and waiting for his backup officers to arrive at the scene and allow him to place them under arrest. It is inconceivable to suppose that such a proper display of lawful authority, standing alone without even an allegation of the use of excessive physical force, violates the Fourth Amendment. See Gumz v. Morrissette, 772 F.2d 1395, 1400-01 (7th Cir. 1985); Holland v. Harrington, 268 F.3d 1179, 1191 (10th Cir. 2001) (en banc); see also State v. Richardson, 156 Wis.2d 128 (Wis. 1990). Mindful of these facts and the applicable case law, and in compliance with the Supreme Court's mandate on remand, I agree and concur with the decision of my colleagues to set aside the jury verdict, although I reach this result for separate and distinct reasons.

I see no merit to the plaintiffs' legal claim, based on nothing but speculation and a foundation of quicksand, that Defendant Coffey violated the Fourth Amendment by calling for backup help with the knowledge that his fellow officers' response would be unreasonable. Coffey gave undisputed testimony at trial that he did not request any specific number of squad cars or officers to respond to his call for backup assistance. Coffey also gave the unchallenged testimony that he neither knew how many officers would respond, nor how quickly much less whether, in fact, they would respond at all. Nor did he give any directions, signals or orders to the officers as to what actions they should take once they arrived upon the scene. (Tr. 2-98 to -99; 2-154 to -156.) Admittedly, seven officers driving separate squad cars responded to Coffey's 10-80; four of these officers exited their vehicles and aimed their loaded weapons at the McNair brothers. Yet it is apparent that Coffey did not personally control the acts of other Fitchburg patrolmen, much less the law enforcement officers from the outlying areas. Furthermore, the officers' collaborative display of firearms conformed with standard police procedures in all respects, and the McNairs never have argued that the procedures themselves authorize an unreasonable response to an officer's call for assistance. Cf. Monell v. New York Dep't of Soc. Servs., 436 U.S. 658 (1978); Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994); Byrd v. Brishke, 466 F.2d 6, 10 (7th Cir. 1972).

Finally, even assuming that the actions of the officers on the scene could be somehow attributed to Officer Coffey, I am of the opinion that the combined response of all the officers would still pass Fourth Amendment muster. We are fighting a war on drugs at a time when the population is increasingly desensitized to violence, and assaults against police officers are frequently applauded or even encouraged by certain elements of pop culture. An officer, working alone at night without a partner, who has probable cause and encounters what he believes to be three suspects acting suspiciously and fleeing from the vicinity of a known drug house, is entitled to seize the suspects using greater force than is usually necessary during a routine traffic stop.

At the time of the seizure, none other than the arresting officer and, perhaps, an officer assisting, laid a hand upon either of the McNairs except to take them into custody and eventually charge Victor McNair with failing to obey an officer's sign or signal and driving with a suspended license. "Where the undue force underlying an excessive force claim primarily consists of an abstract demonstration of force

and not its actual use, a justified finding of liability under sec. 1983 would be most unusual." Gumz, 772 F.2d at 1401. The McNairs were in custody for less than an hour at the scene; they were never conveyed to the station and booked; and they experienced only momentary fright during the hour or so following their seizure, along with some later disgust they attributed to their subjective belief of having been victimized. They did not complain at the time of their arrest, nor did they file a formal complaint with the department any time thereafter. They testified that they never sought counseling or visited a doctor, never missed any work or any jam sessions with the music group to which they belonged, and never experienced any subsequent physical or emotional problems. Indeed, they failed to produce even one single independent witness to corroborate their allegations of mental anguish and emotional distress. Because of the lack of objective evidence, and for the reasons previously stated, the jury verdict must be set aside and this case dismissed. See id. (reversing jury award in display of force case); see also Richard v. City of Harahan, 6 F. Supp.2d 565, 573-74 (E.D. La. 1998) (granting summary judgment when plaintiff "offered no psychological, medical, or other corroborating evidence to establish an injury.")

Very recently, the Seventh Circuit sustained a summary judgment ruling that an officer used reasonable force in a case that is far more egregious and troubling than this one. The police in Smith, 242 F.3d at 744, activated their sirens and followed a suspect for twelve blocks before he finally decided to pull over and comply with the officer's directions. We reasoned that the suspect's actions created the appearance of flight, thereby "justifying the use of a higher degree of force to protect the community and the officers than that needed for someone who committed only a minor traffic violation." Id. The police forcibly pulled the man from his vehicle, pinned his arms behind his back, slammed him against the hood of the vehicle, and handcuffed him. We held that the "officers' use of force here was not high, let alone excessive" under the circumstances. Id. Moreover, it was of no consequence that the man claimed he did not commit a traffic violation, hear the siren, or know he was being followed by police (they were in plainclothes and an unmarked car) because we assessed the factual situation from the officer's point of view at the time of the arrest, not the suspect's, as case law mandates./10 See id.

The show of force by Officer Coffey and his summoned assisting partners in this case pales in comparison to the force outlined above in Smith,

even though the McNairs potentially posed a far more serious safety risk to the law enforcement officials involved--as well as to the general public. Accordingly, in light of Gumz and Smith, and for the foregoing reasons, I am convinced that no rational, properly instructed jury could have found in the McNairs' favor on their constitutional claim. All of Officer Coffey's actions were reasonable under the United States Constitution. Therefore, the district judge should have dismissed this suit at the outset, when Coffey first filed for summary judgment.

III.  THE OUTER LIMITS OF
THE FOURTH AMENDMENT

   Though I agree that this case should be dismissed, I have reservations about the author of the majority's overbroad, categorical statement that a citizen must be victimized by "physically abusive governmental conduct" in order to state a constitutional claim for damages. Ante at 7. The presence or absence of physical injuries, of course, is an important factor in determining whether the police have acted reasonably. Indeed, in cases like this one, when the police have probable cause to arrest suspects who are fleeing from custody and may possibly be armed and dangerous, a Fourth Amendment claim raised by victims who have suffered no physical injuries should be deemed frivolous. Yet, based on the record and the question posed by the Supreme Court's remand, I see no need to reach an issue that is not before us, possibly create tension with decisions in Jones, 214 F.3d 836, and Williams, 1997 WL 264361, and leave the impression that an excessive display of force, when divorced from its actual use, can never rise to the level of a freestanding Fourth Amendment violation. Accordingly, I must dissent from the majority's opinion to the contrary.

   In Gumz, 772 F.2d at 1401, we expressly declined to hold that "some type of bodily injury is an absolute requirement to sec. 1983 liability based on an excessive force claim." Indeed, our own precedents suggest that there may arise exceptional circumstances that could conceivably produce a successful Fourth Amendment claim absent any use of force. For example, the majority in Jones opined that a suspect would have had "a serious" likelihood of success in a Fourth Amendment damages claim when the police, after complying with the knock-and-announce rule, took a battering ram to the suspect's front door and temporarily stunned the suspect by detonating a flash-bang device in the room where the suspect was standing and a child may have been present./11 Jones, 214 F.3d at 837-38 ("[i]f

this were a damages action seeking compensation for injury to the occupants or the door, the claim would be a serious one.") Id. at 838. It made no difference to the majority that a flash-bang inflicts no physical injuries and is only "a-non-lethal device that produces a flash and a gunshot-type noise that stuns and disorients for about six to eight seconds." Id. at 840 n.4 (Coffey, J., concurring in judgment and dissenting in part). Similarly, in Williams, 1997 WL 264361 at *7, the district court denied a motion for qualified immunity when the record recounted that an officer held a gun to the head of an arrestee and threatened to "'blow his brains out' if he caused trouble," even though the man was unarmed, handcuffed, and cooperative at the time. The arrestee had been taken into custody in Georgia; the officer was transporting the man to Illinois and became unreasonably angered and took unacceptable action when the man stated that he had neither received an extradition hearing nor waived his right to the same. Id. at *1.

Wilkins v. May, 872 F.2d 190 (7th Cir. 1989), which is cited in the majority opinion for the proposition that "a simple display of force . . . does not violate the Fourth Amendment," ante at 6, relies on outdated case law and is arguably inapposite. Wilkins cites a series of Fifth Circuit cases suggesting that physical injuries are required when the allegedly excessive force occurs during an otherwise proper arrest. Id. at 193-94. These cases, however, were decided under the pre-Graham "shocks the conscience" standard, which we have noted "constitutes an even higher burden for plaintiffs than the objective reasonableness test." McDonald, 966 F.2d at 294. More recent Fifth Circuit authority has limited the cases cited by Wilkins, recognizing that a citizen can possibly succeed on a Fourth Amendment claim, even when he or she suffered no physical injuries and was seized on probable cause. Petta v. Rivera, 143 F.3d 895, 907-09 (5th Cir. 1998); Richard, 6 F. Supp.2d at 573-74. And, in any event, our holding in Wilkins was that the Fourth Amendment does not apply to claims of police abuse occurring during the time frame transpiring between a suspect's arrest and conviction. See Brokaw v. Mercer County, 235 F.3d 1000, 1018 n.14 (7th Cir. 2000); Reed v. City of Chicago, 77 F.3d 1049, 1052 (7th Cir. 1996).

Graham's totality-of-the-circumstances inquiry accounts for the fact that officers frequently are called upon to make split-second decisions, and are entitled to draw their weapons in a manner reasonably calculated to protect their own safety and the safety of the general public, when called upon, in order that they might carry out

their lawful duties in a proper manner. We must take into consideration the officer's knowledge, experience, and understanding of the law, analyzing the officer's actions in light of all relevant factors, including but not limited to: the seriousness of the crime and the existence of probable cause; the officer's knowledge of the suspect's police record and previous behavior upon encountering the police; the presence ofresistance or flight; the age of the suspect (child or adult); the appearance of the officer (undercover, in assault gear, or standard uniform); the time of day and place of the arrest; the manner in which the weapons were displayed; the use of verbal threats or profanity; and the presence and number of suspects or bystanders. See, for example, McDonald, 966 F.2d at 294-95; Gumz, 772 F.2d at 1397-98; Williams, 1997 WL 264361 at *6-7; Holland, 268 F.3d at 1192-95; Sharrar v. Felsing, 128 F.3d 810, 821-22 (3d Cir. 1997); and Black v. Stephens, 662 F.2d 181, 188 (3d Cir. 1981)--all of which have applied these factors in cases involving allegations of an excessive display of force.

To support its argument that there can be no Fourth Amendment violation without the use of physical force, the majority's author cites to decisions interpreting FELA and the Bankruptcy Code. Ante at 6-7. I fail to understand the relevancy of these decisions, advanced without any elaboration by the majority, for these statutes are intended to guard against entirely separate and distinct evils than does the Fourth Amendment, and thus are far removed from our Fourth Amendment analysis or discussion. FELA's central purpose is to protect workers "from physical invasions or menaces," Conrail Corp. v. Gottshall, 512 U.S. 532, 556 (1994), and the Bankruptcy Code's protection "is financial in character; it is not protection of peace of mind," Aiello v. Providian Fin. Corp., 239 F.3d 876, 879 (7th Cir. 2001). By comparison, "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Schmerber v. California, 384 U.S. 757, 767 (1966); see also Holland, 268 F.3d at 1179 ("the interests protected by the Fourth Amendment" include "a person's 'sense of security' and individual dignity.")

When Officer Coffey attempted to arrest the McNairs, and they were foolishly attempting to flee from him in the dark of night, the responding officers had grounds to establish probable cause and to seize the McNairs using whatever reasonable means were necessary. However, I am reluctant to agree with the author

of the majority opinion, in the absence of additional facts and without the benefit of briefing and oral argument by the parties, that the immediate risk of serious injury or death due to the slip of a finger, a stumble, or some other mishap can be cavalierly disregarded. See, e.g., Jones, 214 F.3d at 837-38; Williams, 1997 WL 264361 at *7.

At the same time, I am troubled with and, thus, cannot accept the full implications of Judge Cudahy's statement that there is "no distinction, as a matter of principle, between the use of force and its display, provided that the suspect submits." Ante at 9. Nor do I agree with his re lated argument that a suspect's subjective reaction to an officer's display of force is probative evidence that an officer behaved in an objectively unreasonable manner. Although Judge Cudahy believes that "[t]he mental state of the terrorized is at least one measure of the objective reasonableness of the terror applied," id. at 8, plaintiffs can all too easily fabricate claims of mental anguish and emotional trauma, and I am of the opinion that a suspect cannotestablish constitutional injury if he is unable to corroborate his self-serving allegations with objective evidence, such as medical testimony or outward manifestations of harm. See Richard, 6 F. Supp.2d at 573-74.

IV.  CONCLUSION

I conclude that it may be possible (yet unlikely) for an excessive display of force in the modern era to violate the Fourth Amendment. Accordingly, I respectfully dissent from those portions of the majority opinion that would extinguish the possibility of a Fourth Amendment claim based on injuries resulting from an unreasonable show of force. However, I concur with the majority's decision to set aside the jury verdict and affirm the district court's dismissal of this case. Because Officer Sean Coffey acted reasonably and within the framework of the Constitution, this case should be dismissed as a matter of law for a failure of proof.

As a final matter, I note that Officer Coffey is entitled to recover his appellate costs, as well as his costs before the district court, as the prevailing party in this lawsuit. When the trial judge calculated Coffey's costs prior to McNair I, they totaled a modest $1,508.11; I assume he has incurred additional expenses over the thirteen months since that decision was rendered. In the same vein, I point out that the district court's order awarding sec. 1988 attorney's fees of $103,292.34 to Plaintiffs

following McNair I--an inflated sum representing more than ten times the amount won by Plaintiffs at trial--must be vacated.

FOOTNOTES

/1 I wish to make clear that I neither know nor am I acquainted with or related to Appellee Sean Coffey.

/2 In the section of their brief titled "Victor R. McNair Was Not Deprived Of His Fourth Amendment Rights," Coffey's attorneys argued, "We believe Officer Coffey's response to the situation presented to him by the plaintiffs was objectively reasonable as a matter of law, both under the Fourth Amendment and as prudent police work." (Doc. No. 34 at 6, 9.) The motion was denied.

/3 Coffey's attorney raised an oral motion for directed verdict at the close of the plaintiffs' case, stating, "Your Honor, now that the plaintiffs have rested their case, we believe that there is no legally sufficient evidentiary basis for a reasonable jury to find for the plaintiffs on the issue of reasonableness of Officer Coffey's actions. No excessive force has been proved by the plaintiffs, and under the controlling law, we believe the plaintiffs' excessive force claims cannot be maintained and, therefore, need to be dismissed." (Doc. No. 98 Ex. A at 2 (Tr. 2.)) The motion was denied.

/4 Prior to the conference on jury instructions, Coffey's attorney notified the court, "I renew my Rule 50 motion that now that the entire case has been heard, we're entitled to a judgment of dismissal as a matter of law." (Id. Ex. B at 5 (Tr. 5.)) The motion was denied.

/5 In a post-trial Rule 59(e) motion, Coffey's attorneys sought to alter or amend the verdict on the basis of qualified immunity. They argued that, "as shown by Officer Coffey's training and by court precedents, a reasonable police officer could well have believed the force he used against the plaintiffs was constitutional." (Doc. No. 93 at 10.) The court granted the motion, finding that "a reasonable police officer could have believed that the high risk procedure Defendant Officer Coffey used was lawful based on the law on December 20, 1997 when force was used in this case." (Doc. No. 103 at 6.)

/6 The majority seems to be of the opinion that an excessive display of force "could have consequences under the Fourth Amendment" only if, for example, "a suspect's consent to search were prompted by fear that the officers would react

violently to a refusal," or if "edgy officers opened fire." Ante at 7.

/7 Various affidavits and depositions were presented to the district court at summary judgment, demonstrating the absence of any genuine issue of material fact for trial. I discuss these relevant facts throughout my opinion. They are cited in Defendant's Second Proposed Findings of Fact paras. 6-15, 18-33, 35-60, 64-66, 68-78 and 107-09, which were not the subject of any objection by Plaintiffs, and those portions of id. paras. 61-63, 67, 79, which were not the subject of legitimate objection by Plaintiffs. See also the depositions and affidavits cited in Plaintiffs' Proposed Additional Findings Of Fact paras. 22, 25-27, 31, 33-42, 44-45.

/8 My concurring colleague states in his opinion that he is "none too sure what Saucier requires here . . . ". Ante at 8.

I believe that, although Coffey's Rule 59(e) motion does not argue that the jury verdict was based on legally insufficient evidence, we may still consider the purely legal question of whether Coffey violated the Fourth Amendment. We are vested with discretion to review the record in its entirety and address the district court's ruling on any ground fairly supported therein. See Bakalis v. Golembeski, 35 F.3d 318, 321-22 (7th Cir. 1994) (invoking court's discretionary power of review in qualified immunity case); Shields v. Burge, 874 F.2d 1201, 1210 n.2 (7th Cir. 1989) (same; granting immunity on grounds raised in district court but not on appeal).

Furthermore, as pointed out above, I believe that the Supreme Court mandated that we consider whether the McNairs proved a constitutional violation, in light of the relevant law applied to the circumstances of this case. See Saucier, 121 S.Ct. at 2155-56 ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.")

/9 The record reflects that the McNairs less than credibly claimed to have been comfortable visiting the dangerous, high-crime Allied-Dunns Marsh neighborhood for social purposes immediately prior to their arrest, yet fled the scene because they feared encountering a police officer in full uniform, occupying a clearly

designated police squad car in the same vicinity, who was entrusted with ensuring their safety. (Appellants' Br. at 8-9.)

/10 Smith was decided on March 6, 2001, which was long after the night of the McNairs' arrest on December 20, 1997. However, at no point in their Circuit Rule 54 statement--which was filed on August 15, 2001 (after the Smith decision)--do the McNairs argue that Smith is inconsistent with any of our decisions rendered prior to December 20, 1997.

/11 Jones, a drug dealer, sought to suppress marijuana, cocaine, and drug paraphernalia obtained after the police executed a search warrant of his home. Three or four officers barged into the house after breaking down an unlocked door with a battering ram and setting off a flash-bang device that distracted Jones and left him temporarily stunned or disoriented. 214 F.3d at 837-38. Because the police were lawfully on the premises, having served a valid search warrant, we denied the motion to suppress, reasoning that the evidence would inevitably have been discovered, despite the majority's agreement with "the strength of the contention that the officers behaved inappropriately." Id. at 838.